1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

Xavier Smith,

10                                    Plaintiff,          No.

11          v.

12   Microsoft Corporation,                          COMPLAINT – CLASS ACTION

13                                    Defendant.       JURY TRIAL DEMANDED

14

15          Plaintiff Xavier Smith alleges the following based upon personal knowledge, information

16   and belief, the investigation of his attorneys, and publicly available materials. He brings this

17   case, on behalf of himself and all others similarly situated, against Defendant Microsoft

18   Corporation ("Microsoft").

19                    **I.       INTRODUCTION**

20          1.       Affiliate links connect shoppers, content creators, and retailers in the digital

21   economy. Each affiliate link is a unique URL posted by a content creator to earn commissions on

22   products the creator recommends. When a member of the creator's audience clicks on an affiliate

23   link and purchases a recommended product, the creator receives a portion of the sale as

24   compensation. This process is seamless to the shopper and rewards affiliates who drove the sale.

25          2.       Browser extensions are small software programs that add features to a user's

26   internet browser. Microsoft Shopping, offered by Microsoft, is one such browser extension.

COMPLAINT - 1

Microsoft claims that Microsoft Shopping helps its users save money by finding and applying coupon codes during the online shopping checkout process.

3.    Browser extensions such as Microsoft Shopping and Paypal's "Honey" may or may not save their users money, but they make a lot of money for themselves. Among other unscrupulous practices, it recently came to light that browser extensions like Microsoft Shopping make money by inserting themselves into the affiliate marketing operation.

4.    When a shopper, who has browser extensions like Honey or Microsoft Shopping installed, clicks an affiliate link and purchases a product, the content creator who posted the link should receive the affiliate commission for the sale, because they provided the last link or affiliate code that was clicked before the user made their purchase.

5.    Instead, as revealed in YouTuber MegaLag's video,[1] the Honey browser extension intervenes at the last second, replacing the affiliate code with its own. As a result, PayPal receives the affiliate commission owed to the content creator—even though Honey played no role in referring the shopper to the retailer. Moreover, Honey replaces the affiliate code even when it finds no coupon code for the shopper.

6.    This practice is not unique to Honey. For example, Microsoft Shopping is also believed to engage in similar practices that replace the affiliate cookie from a content creator's unique information and insert a source code with Microsoft's information.

7.    Through these deceptive practices, Microsoft Shopping deprives creators of the revenue they depend on to sustain their businesses.

8.    Plaintiff Xavier Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income

---

[1] MegaLag, "Exposing the Honey Influencer Scam" (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk.

COMPLAINT - 2

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

from affiliate links varies between approximately $500 and $2,500 per month. In 2023, he began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Microsoft Shopping's interference.

9.    Smith's example is not isolated. Microsoft Shopping's technology operates behind the scenes to affect any and all affiliate codes during checkout and redirect commissions to itself.

10.    While Microsoft Shopping markets itself as a tool to help users save money, its practices come at a significant cost to creators like Smith. Arizona law prohibits such conduct, which constitutes conversion, unjust enrichment, intentional interference with contractual relations and prospective economic advantage, and which violates the Arizona Unfair Trade Practices Act. Smith is bringing this lawsuit on behalf of himself and others similarly situated in order to recover what has been lost.

## II.    JURISDICTION AND VENUE

11.    This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one member of the proposed class is a citizen of a state different from that of the Defendant Microsoft; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

12.    This Court has personal jurisdiction over Microsoft under 28 U.S.C. § 1407, because Microsoft has sufficient minimum contacts in the Western District of Washington, and because Microsoft has otherwise intentionally availed itself of the markets within the Western District of Washington through business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

13.    Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Washington and because Microsoft maintains its principal place of business in Redmond, Washington.

COMPLAINT - 3

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

### III.    PARTIES

**A.    Plaintiff**

14.    Plaintiff Xavier Smith resides in Arizona. Mr. Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between $500 and $2,500 per month. In 2023, he began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Microsoft Shopping's interference. Smith has never himself used Microsoft Shopping and did not know that Microsoft Shopping was stealing his affiliate commissions.

**B.    Defendant**

15.    Defendant Microsoft Corporation is a Washington corporation organized and incorporated under the laws of Delaware. It transacts business and is headquartered within this judicial district at 1 Microsoft Way, Redmond, Washington 98052.

### IV.    FACTS

16.    In the mid-2000s, it came to light that a man named Brian Dunning had orchestrated a scheme to exploit eBay's affiliate program. Using a technique known as "cookie stuffing," Dunning's websites secretly planted eBay affiliate cookies on visitors' browsers. This happened without their knowledge or any direct interaction with eBay links. If those visitors later shopped on eBay, the system falsely credited Dunning as the referrer, allowing him to claim commissions for sales he had no role in generating. The scheme, which operated undetected for years, funneled millions of dollars in illicit earnings to Dunning. After an extensive investigation, federal authorities charged him with wire fraud, leading to his guilty plea in 2013. Dunning was sentenced to 15 months in federal prison.

17.    Microsoft has taken a page out of Dunning's playbook. Through its Microsoft

COMPLAINT - 4

Shopping extension, it too improperly inserts its own affiliate cookies on shopper's browsers. As a result, affiliate marketing programs falsely credit Microsoft Shopping as the referrer, allowing it to claim commissions from sales it had no role in generating. Its scheme has funneled millions of dollars in illicit earnings to Microsoft. Whereas Dunning stole from eBay (which otherwise would have paid no commissions on the sales), Microsoft Shopping is stealing from anyone who provides affiliate links, from large product recommendation websites to small-scale content creators.

18. This complaint will describe how it all works: the affiliate marketing landscape, the role of browser extensions, Microsoft Shopping's marketing, Microsoft's scheme to skim affiliate commissions, and the harm caused to content creators.

## A. Affiliate links

### 1. The use of affiliate links

19. A content creator is someone who produces material such as videos, articles, podcasts, or social media posts to engage an audience and earn income from their work. Creators generate revenue through sponsored content, affiliate marketing, ad revenue, merchandise sales, and/or subscriptions.

20. Affiliate links are special links that content creators use to make money online. When a creator shares an affiliate link on his social media platform, it directs his audience to a product or service on a retailer's website. If a person clicks on the link and buys something, the creator who shared the link earns a commission, which is usually a small part of the sale price or a set amount.

21. Creators can share these links on various social media platforms. The timing and method of sharing depend on the platform and the affiliate's audience. On Instagram, creators might include links in their bio, stories, or captions. On TikTok, they place links in their bio or share them in the comments of their videos. YouTube creators might include affiliate links in their video descriptions or pinned comments, often alongside product reviews or tutorials.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Twitter users may tweet links along with engaging posts. Creators can also use platforms like Facebook or Pinterest, where links can be shared in posts, groups, or on boards.

22.     The creators who use affiliate links are often sharing products they love. They might be bloggers, influencers, or everyday social media users who have built trust with their audience. Creators often spend time researching products, creating content, and engaging with their followers to make sure their recommendations are helpful and genuine. By doing this, they not only earn money but also provide value to their audience by highlighting useful or interesting products.

23.     Some creators rely on affiliate commissions for bonus income—perhaps several hundred dollars a month. Other creators develop sufficient audience engagement to earn a living from affiliate commissions alone, allowing them to pursue and share their passion online.

### 2.     The operation of affiliate links

24.     Affiliate links operate through unique URLs and cookies. When someone clicks an affiliate link posted by a content creator, the link contains information about the creator, such as their unique ID. An affiliate link might look like a normal website link but with extra text added. For example, a link to a product might be "www.company.com/product" while an affiliate link could be "www.company.com/product?affiliate=12345". The extra part at the end ("?affiliate=12345") is what tracks the affiliate's unique ID.

25.     The affiliate link passes data to the retailer's website, which stores the data in a "cookie" on the customer's device. A tracking cookie is a small piece of data that a website stores on a user's computer or device to monitor online activity. It acts as a virtual note that allows the website to remember specific actions, such as visited pages or items placed in a shopping cart. Some cookies can also track activity across multiple websites, often for targeted advertising or analytics purposes.

26.     Cookies associated with affiliate links track the customer's activity, such as browsing and purchasing. If the customer makes a purchase of the relevant product within a

COMPLAINT - 6

certain period, the creator earns a commission.

27.    To address the scenario where a user has clicked on multiple affiliate links before making a purchase, the affiliate marketing industry, for the most part, uses the "last click" model to assign attribution for the referral. That model attributes the sale to the affiliate who provided the final link clicked by a customer before making a purchase. This system is designed to attribute the revenue to the source that directly drove the conversion. For example, if a customer clicks on an affiliate link on a blogger's website but later clicks a different affiliate link from another source before completing their purchase, the second affiliate—the one with the last click—is the one who gets credit for the sale.

28.    Major companies like Amazon, Walmart, and Target offer affiliate programs. Amazon's Affiliate Program, often called Amazon Associates, allows affiliates to earn commissions by promoting millions of products sold on its platform. Affiliates can generate links for specific products and share them with their audience. Commissions vary depending on the product category.

29.    Walmart's Affiliate Program operates similarly, offering links to a variety of products. Affiliates earn a percentage of the sales they drive, and the program includes tools to help affiliates track their performance. Target also provides an affiliate program that appeals to affiliates promoting household goods, clothing, and other everyday items.

30.    Specialized companies, such as Shopify or Bluehost, also run affiliate programs tailored to specific audiences. Shopify's program is popular among entrepreneurs and small business owners, while Bluehost's affiliate program is aimed at people promoting web hosting services.

31.    How much money an affiliate earns depends on factors like the commission rate, the price of the product, and how many people ultimately buy products recommended through their links.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**B.    Browser extensions**

32.    An internet browser extension is a small software program that enhances the functionality of a web browser. Extensions are designed to perform specific tasks or add features that improve the user's browsing experience. They can be installed directly from the browser's extension store or marketplace, such as the Chrome Web Store or Microsoft Add-ons site, and are typically lightweight, meaning they use minimal system resources.

33.    Browser extensions work by integrating with the browser's architecture and running alongside it. They often add new buttons, menus, or tools to the browser's interface. For example, an ad blocker extension might prevent advertisements from displaying on web pages, while a password manager extension could help users securely store and autofill their login information.

34.    Extensions operate using permissions granted by the user during installation. These permissions allow the extension to interact with web pages or access specific types of data. For example, an extension that saves shopping deals might request permission to read and modify the content of websites visited by the user. While these permissions enable extensions to function, they can also raise privacy concerns if data collection practices are not transparent.

35.    Most extensions are built using web technologies like HTML, CSS, and JavaScript, making them easy to develop and compatible with various browsers. They can be updated regularly to fix bugs or add new features, ensuring they remain useful and secure. However, users are advised to install extensions only from trusted sources and to review permissions carefully to avoid potential security or privacy risks.

**C.    The Microsoft Shopping browser extension**

36.    In November 2020, Microsoft began offering the Microsoft Shopping browser extension integrated directly into Microsoft Edge, the default internet browser on Windows computers and the third most popular browser in the United States.

37.    Since its introduction in 2020, Microsoft Shopping is now available for download

COMPLAINT - 8

and use with other popular internet browsers like Chrome. Once installed, it operates in the background as people shop.

38.     The extension also works when users shop via Bing.com, including through other browsers like Firefox and Safari.

39.     The Microsoft Shopping browser extension is a specific example of a tool designed to save users money while shopping online. Once a user opens Microsoft Edge and logs into their account (or once users install the extension on Google Chrome or use any browser to access the "Shopping" tab on Bing.com), Microsoft Shopping integrates with the browser and becomes active when users visit online shopping websites. Microsoft Shopping purports to scan for potential coupon codes, discounts, or deals that might apply to the items in the user's shopping cart.

40.     Anyone who uses the Microsoft Edge browser will have the ability to automatically apply Microsoft Edge Shopping. Accordingly, there are potentially millions of users of the Microsoft Edge Shopping extension.

41.     Microsoft Shopping offers cashback rewards from thousands of online retailers.

42.     Microsoft Shopping applies coupons using a multi-step process. First, when a user reaches the checkout page of a supported website, Microsoft Shopping identifies the platform, whether any cashback rewards are available, and its coupon code input fields. Next, it connects to its database of known coupon codes for that specific retailer. This database is built from various sources. Once Microsoft Shopping retrieves the available codes, it produces a list of potential coupon codes for a user to plug in.

43.     If no coupons are identified, Microsoft Shopping informs the user but still attempts to display other potential savings opportunities, such as cashback offers or related deals.

44.     Microsoft Shopping also offers a rewards program with participating retailers through Bing and Microsoft Edge. This feature enables users participating in the Microsoft Rewards program to earn cashback (Microsoft Cashback) while shopping at participating stores,

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

which is later paid out via PayPal after the purchase is confirmed. By offering cashback, Microsoft Shopping incentivizes customers to complete their purchases through the extension.

45. To function effectively, Microsoft Shopping requests permissions to read and modify the content of websites visited by the user. This enables it to identify the shopping site, detect the items in the cart, and interact with the checkout process. In addition to applying a coupon code or cashback rewards, Microsoft Shopping also inserts its own affiliate code, so that it receives any available affiliate commissions from its users' purchases.

**D.    Microsoft Shopping's theft**

46. For those shoppers who have Microsoft Shopping installed or automatically running on Microsoft Edge, Microsoft Shopping intercepts affiliate cookies created by content creators' affiliate links and replaces them with its own affiliate code. This practice redirects the commission from the original creator to Microsoft Shopping, depriving the creators of their rightful earnings.

47. Microsoft Shopping's ability to alter affiliate cookies is rooted in its browser integration and permissions. When a shopper clicks on the Microsoft Shopping extension pop-up and clicks the blue "OK" button to activate cashback rewards, Microsoft Shopping removes the content creator's affiliate cookie and replaces it with their own.

48. Upon information and belief, Microsoft Shopping manages to do this by invisibly removing the affiliate cookie previously loaded into the user's browser and replacing it with Microsoft's own cookie. Upon information and belief, the permissions Microsoft Shopping requests from its users allow Microsoft Shopping to insert its own cookie during the checkout process.

49. Because affiliate marketing operates on the "last click" model, Microsoft Shopping gets the credit for the sale. Microsoft Shopping's scheme is especially effective because it inserts its cookie at the very last point of the transaction, as the shopper is completing the checkout process. Content creators cannot compete with Microsoft Shopping's access to the

COMPLAINT - 10

last moment of the shopping journey.

**E.     Harm to content creators**

50.     Mr. Smith is an entrepreneur and author who shares knowledge about fitness, nutrition, and life skills. As part of his business, he recommends products to support his audience's fitness and nutrition goals. He works hard to create content that will interest his audience and lead them to click on the affiliate links that he posts. He partners with affiliate programs to receive commissions when his audience buys products that he recommends.

51.     He posts affiliate links to these products and others on Facebook, LinkedIn, Instagram, Threads, Pinterest, Twitter/X, and other platforms. His income from affiliate links varies between $500 and $2,500 per month.

52.     In 2023, Mr. Smith began to see a decrease in these commissions of several hundred dollars per month. He attributes the decline to Microsoft Shopping's interference.

53.     Mr. Smith has never himself used Microsoft Shopping and did not know that Microsoft Shopping was stealing his affiliate commissions.

## V.     STATUTE OF LIMITATIONS

54.     Microsoft Shopping did not disclose its affiliate-code-replacement scheme. Instead, Microsoft Shopping relied on technical complexity, user trust, the affiliate marketing process, and its own marketing to actively conceal its conduct.

55.     The technical complexity of affiliate cookie replacements obscured Microsoft Shopping's actions. Microsoft Shopping's operations occurred entirely in the background. Once the extension was installed, it integrated seamlessly with the browser and monitored user activity on shopping websites without any visible indication of its interference with affiliate cookies.

56.     Microsoft Shopping relied on user trust and permissions granted during installation. By requesting broad access to modify webpage content, Microsoft Shopping could replace affiliate codes as part of its purported coupon search process. Microsoft Shopping users were unaware of the technical details or implications of these permissions.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

57.     Content creators had no direct visibility into this process. The substitution of Microsoft Shopping's affiliate cookie happened during the shopper's checkout, after the shopper had left the content creator's site. Content creators had no mechanism to track whether their codes were being replaced or otherwise altered. Content creators typically rely on reporting tools provided by affiliate programs to monitor clicks and commissions. However, these tools do not reveal if or when the affiliate codes were replaced mid-transaction, leaving affiliates unaware of the potential loss of revenue.

58.     Microsoft Shopping's promotional messaging focused heavily on its consumer benefits, such as saving money through automated coupon applications. This marketing diverted attention from Microsoft Shopping's interactions with affiliate marketing. By framing itself as a tool for user savings, Microsoft Shopping avoided scrutiny from both shoppers and content creators regarding its broader impact on affiliate marketing.

59.     Thus, any applicable statute of limitations has been tolled.

60.     In addition, Microsoft's actions and omissions constitute overt acts that began a new statute of limitations because those acts advanced the unfair objectives of the scheme. Each replacement of an affiliate code constitutes a new and independent act that perpetuates the scheme.

## VI.    CLASS ALLEGATIONS

61.     Mr. Smith brings this case as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), on behalf of himself and all other similarly situated.

62.     Mr. Smith brings this case on behalf of a class as defined as follows: All people who lost revenue that they would have otherwise received from affiliate links because Microsoft overrode their affiliate cookie information with its own.

63.     Excluded from this class are Microsoft and its employees or agents and any judicial official presiding over this action, and members of their families.

64.     There are thousands of members of the proposed class, and the class is thus so

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    numerous that joinder of all members is impracticable.

2        65.    Microsoft has acted or refused to act on grounds that apply generally to the class,

3    so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a

4    whole

5        66.    Common questions of law and fact exist as to all members of the class. These

6    questions predominate over any questions solely affecting individual members of the class.

7    Among the questions of law and fact common to the class are:

8            A.    Whether Microsoft used the Microsoft Shopping browser extension to

9        replace the content creator's affiliate codes with its own;

10            B.    Whether Microsoft received commissions that were properly awarded to

11        content creators;

12            C.    Whether Microsoft unfairly took advantage of the operation of affiliate

13        codes in order to reap commissions for itself;

14            D.    Whether Microsoft's conduct was knowing and willful;

15            E.    Whether Microsoft actively concealed this conduct;

16            F.    Whether Microsoft's practices were unfair and deceptive;

17            G.    Whether class members consented to Microsoft's practices;

18            H.    Whether Microsoft's conduct violated Arizona laws;

19            I.    How much Microsoft profited from its practice;

20            J.    Whether Microsoft is liable for damages; and

21            K.    Whether Microsoft's conduct should be enjoined.

22        67.    Mr. Smith is a member of and will fairly and adequately represent the class,

23    protecting the interests of the class members. Mr. Smith has retained competent counsel

24    experienced in class action litigation and intends to prosecute this action vigorously.

25        68.    Mr. Smith does not have interests antagonistic to, or in conflict with, the interests

26    of the other members of the class.

COMPLAINT - 13

69.    Mr. Smith's claims are typical of the claims of the members of the class.

70.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.    CLAIMS

### COUNT ONE — CONVERSION

71.    Mr. Smith brings this claim on behalf of himself and the nationwide class.

72.    Mr. Smith incorporates the allegations above.

73.    Microsoft wrongfully exercised control over Mr. Smith's property.

74.    Mr. Smith had the right to possess the commissions from purchases made by members of his audience who clicked on his affiliate links and completed a purchase of the product or products associated with the link.

75.    Microsoft substantially interfered with Mr. Smith's right to possess those commissions by knowingly or intentionally replacing Mr. Smith's affiliate codes with its own and thereby taking possession of the commissions that Mr. Smith would have otherwise received.

76.    Mr. Smith did not consent to this practice—indeed, he had no idea that Microsoft was using the Microsoft Shopping browser extension to convert his property in this manner.

77.    Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

78.    Microsoft's conduct was a substantial factor in causing Mr. Smith's harm: but for Microsoft's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

79.    Thus, Microsoft owes to Mr. Smith the amount of commissions that it stole from him through its affiliate-code-replacement scheme.

COMPLAINT - 14

## COUNT TWO —  RESTITUTION BASED ON QUASI-CONTRACT OR UNJUST ENRICHMENT

80.    Mr. Smith brings this claim on behalf of himself and the nationwide class.

81.    Mr. Smith incorporates the allegations above.

82.    Microsoft must restore to Mr. Smith commissions that Microsoft received from online third-party retailers, but that really should belong to Mr. Smith.

83.    Mr. Smith is entitled to restitution because Microsoft knew or had reason to know that Microsoft diverted affiliate commissions that would have been properly paid to Mr. Smith.

## COUNT THREE —  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

84.    Mr. Smith brings this claim on behalf of himself and the nationwide class.

85.    Mr. Smith incorporates the allegations above.

86.    Mr. Smith claims that Microsoft intentionally interfered with the contract between him and third-party companies with affiliate marketing programs.

87.    There was a contract between Mr. Smith and third-party affiliate marketing programs.

88.    Microsoft knew of the arrangement between Mr. Smith and the affiliate marketing companies. Microsoft is aware of affiliate marketing relationships because it takes advantage of them itself and it knows that shoppers navigate to retailers from content creator's affiliate links.

89.    Microsoft's conduct prevented performance of Mr. Smith's contracts with affiliate marketing programs. Operating as intended, those contracts would have awarded Mr. Smith with commissions for directing shoppers who purchased products on the websites subject to those contracts.

90.    Microsoft either intended to disrupt the performance of Mr. Smith's affiliate marketing contracts or knew that disruption of performance was certain or substantially certain to occur from its conduct.

COMPLAINT - 15

91.    Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

92.    Microsoft's conduct was a substantial factor in causing Mr. Smith's harm: but for Microsoft's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

## COUNT FOUR — INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

93.    Mr. Smith brings this claim on behalf of himself and the nationwide class.

94.    Mr. Smith incorporates the allegations above.

95.    Mr. Smith claims that Microsoft intentionally interfered with an economic relationship between Mr. Smith and third-party affiliate marketing programs that otherwise would have resulted in an economic benefit to Mr. Smith.

96.    Mr. Smith and affiliate marketing programs were in an economic relationship that probably would have resulted in an economic benefit to Mr. Smith.

97.    Microsoft knew of the relationships between content creators and affiliate marketing programs in general and Mr. Smith's in particular.

98.    Microsoft engaged in a scheme in which it replaced Mr. Smith's affiliate marketing codes with its own, such that it wrongfully received the credit for purchases that should have been credited (i.e., that should have paid commission) to Mr. Smith.

99.    By engaging in this conduct, Microsoft intended to disrupt the affiliate marketing relationship or knew that disruption of the relationship was certain or substantially certain to occur when it replaced the affiliate marketing cookies with its own.

100.    The relationship between Mr. Smith and the affiliate marketing programs was disrupted—the affiliate marketing programs paid commissions to Microsoft that were properly owed to Mr. Smith, because he directed the purchaser to the retailer.

101.    Mr. Smith was harmed because he lost out on commissions that he would have

COMPLAINT - 16

otherwise received. He received less income from his affiliate link business.

102.    Microsoft's conduct was a substantial factor in causing Mr. Smith's harm: but for Microsoft's replacement of the affiliate codes, Mr. Smith would have received the commissions when shoppers used his link and completed a purchase.

**COUNT FIVE — VIOLATION OF ARIZONA'S UNFAIR TRADE PRACTICES ACT**

103.    Mr. Smith brings this claim on behalf of himself and the nationwide class.

104.    Mr. Smith incorporates the allegations above.

105.    Microsoft's scheme, as described in this complaint, constituted an unfair and fraudulent business practice under Arizona's Unfair Trade Practices Act.

106.    Microsoft's scheme is unfair because it diverts commissions to itself that would be properly awarded to Mr. Smith, who in fact drove the shopper to make the purchase. Microsoft did not deserve the commissions it diverted, which were intended to reward the person that led the shopper to make the purchase. Microsoft did nothing to lead shoppers to the website to make the purchase. Microsoft's conduct undermines the online affiliate marketing business.

107.    Microsoft's scheme is fraudulent because Microsoft advertises the Microsoft Shopping browser extension as a means for shoppers to save money. In fact, it diverts money to itself through the scheme described in this complaint. And it conceals the mechanisms it uses to replace affiliate codes with its own.

108.    Mr. Smith was harmed because he lost out on commissions that he would have otherwise received. He received less income from his affiliate link business.

109.    Microsoft's conduct was a substantial factor in causing Mr. Smith's harm: but for Microsoft's replacement of the affiliate codes, Mr. Smith would have received commissions when shoppers used his link and completed a purchase.

110.    As a result of Microsoft's violation of the Unfair Trade Practices Act, Mr. Smith is entitled to the return of affiliate commissions that Microsoft diverted to itself.

111.    Mr. Smith is also entitled to restitution in the event that money damages are

COMPLAINT - 17

difficult or impossible to calculate. Even if money damages are available, such damages would not be adequate to address Mr. Smith's harm, which extends to the time he devoted to creating engaging content and developing his affiliate program relationships.

112.    In addition, Mr. Smith is entitled to reasonable attorney fees and costs.

113.    Furthermore, as the violations are ongoing, Microsoft should be enjoined from diverting affiliate commissions as described in this complaint.

## VIII.    RELIEF REQUESTED

114.    Mr. Smith, on behalf of himself and other members of the class, asks the Court for the following relief:

A.    An order certifying the proposed class under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), designating Mr. Smith as named representative of the class, and appointing the undersigned attorneys as class counsel under Rule 23(g);

B.    Actual damages;

C.    Punitive damages;

D.    An order enjoining Microsoft from diverting to itself affiliate commissions properly owed to others;

E.    Attorney fees, expenses, and taxable costs;

F.    Pre- and post-judgment interest; and

G.    For other relief that the Court deems just and proper.

## IX.    JURY TRIAL DEMAND

115.    Plaintiff Xavier Smith demands a jury trial for all issues so triable.

By: */s Cari Campen Laufenberg*
Cari Campen Laufenberg, WSBA #34354

By: */s/ Derek Loeser*
Derek W. Loeser, WSBA # 24274

COMPLAINT - 18

1

2

By: /s/ Adele Daniel
Adele Daniel, WSBA # 53315

3

By: /s/ Kylie Fisher
Kylie Fisher, WSBA # 56982

4

5

By: /s/ Andrew Lindsay
Andrew Lindsay, WSBA # 60386

6

7

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
claufenberg@kellerrohrback.com
dloeser@kellerrohrback.com
adaniel@kellerrohrback.com
kfisher@kellerrohrback.com
alindsay@kellerrohrback.com

8

9

10

11

Christopher Springer (*pro hac vice forthcoming*)
801Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
cspringer@kellerrohrback.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 19

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384